1

2

3

4

5

6

7    UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9    CYRIL SABBAGH, individually and on behalf
of all others similarly situated,

10                                              No.

                              Plaintiff,

11                                              CLASS ACTION COMPLAINT

12         v.

13    CELL THERAPEUTICS, INC., DR. JAMES A.
BIANCO M.D. and DR. JACK W. SINGER
M.D.,

14

15                                  Defendants.

16         Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel,

17    which included a review of United States Securities and Exchange Commission ("SEC") filings

18    by Cell Therapeutics, Inc. ("Cell Therapeutics" or the "Company"), as well as regulatory filings

19    and reports, securities analysts' reports and advisories about the Company, press releases and

20    other public statements issued by the Company, and media reports about the Company, and

21    Plaintiff believes that substantial additional evidentiary support will exist for the allegations set

22    forth herein after a reasonable opportunity for discovery.

23                          **I.     NATURE OF ACTION**

24         1.    This is a federal class action on behalf of purchasers of the common stock of Cell

25    Therapeutics between May 5, 2009 and February 8, 2010, inclusive (the "Class Period"), seeking

26    to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

CLASS ACTION COMPLAINT - 1
Case No.



1918 EIGHTH AVENUE, SUITE 3300 · SEATTLE, WA 98101
(206) 623-7292 · FAX (206) 623-0594

000700-00  358431 V1

## II.    JURISDICTION AND VENUE

2.    The claims asserted herein arise under and pursuant Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

4.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

5.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.    PARTIES

6.    Plaintiff Cyril Sabbagh, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of Cell Therapeutics during the Class Period and has been damaged thereby.

7.    Defendant Cell Therapeutics is incorporated in Washington and maintains its headquarters at 501 Elliott Avenue West, Suite 400, Seattle, WA 98119.  The Company develops, acquires, and commercializes oncology products for cancer treatment.

8.    (a)    Defendant Dr. James A. Bianco M.D. ("Bianco") is the Principal Founder of the Company, and was, at all relevant times, Chief Executive Officer of Cell Therapeutics.

(b)    Defendant Dr. Jack W. Singer M.D. ("Singer") is a Founder of the Company, and was, at all relevant times, Chief Medical Officer and Executive Vice President of Cell Therapeutics.

CLASS ACTION COMPLAINT  - 2
Case No.



1918 EIGHTH AVENUE, SUITE 3300 · SEATTLE, WA 98101
(206) 623-7292 · FAX (206) 623-0594

000700-00 358431 V1

1       (c)    Defendants Bianco and Singer are referred to herein as the "Individual

2 Defendants."

3     9.    During the Class Period, the Individual Defendants, as senior executive officers

4 and/or directors of Cell Therapeutics, were privy to confidential and proprietary information

5 concerning Cell Therapeutics, its operations, finances, financial condition and present and future

6 business prospects. The Individual Defendants also had access to material adverse non-public

7 information concerning Cell Therapeutics, as discussed in detail below. Because of their

8 positions with Cell Therapeutics, the Individual Defendants had access to non-public information

9 about its business, finances, products, markets and present and future business prospects via

10 internal corporate documents, conversations and connections with other corporate officers and

11 employees, attendance at management and/or board of directors meetings and committees

12 thereof and via reports and other information provided to them in connection therewith. Because

13 of their possession of such information, the Individual Defendants knew or recklessly

14 disregarded that the adverse facts specified herein had not been disclosed to, and were being

15 concealed from, the investing public.

16     10.    The Individual Defendants are liable as direct participants in the wrongs

17 complained of herein. In addition, the Individual Defendants, by reason of their status as senior

18 executive officers and/or directors, were "controlling persons" within the meaning of Section

19 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in

20 the unlawful conduct complained of herein. Because of their positions of control, the Individual

21 Defendants were able to and did, directly or indirectly, control the conduct of Cell Therapeutics's

22 business.

23     11.    The Individual Defendants, because of their positions with the Company,

24 controlled and/or possessed the authority to control the contents of its reports, press releases and

25 presentations to securities analysts and through them, to the investing public. The Individual

26 Defendants were provided with copies of the Company's reports and press releases alleged



1    herein to be misleading, prior to or shortly after their issuance and had the ability and

2    opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual

3    Defendants had the opportunity to commit the fraudulent acts alleged herein.

4         12.    As senior executive officers and/or directors and as controlling persons of a

5    publicly traded company whose common stock was, and is, registered with the SEC pursuant to

6    the Exchange Act, and was, and is, traded on The NASDAQ Stock Market ("NASDAQ") and

7    governed by the federal securities laws, the Individual Defendants had a duty to promptly

8    disseminate accurate and truthful information with respect to Cell Therapeutics's financial

9    condition and performance, growth, operations, financial statements, business, products, markets,

10   management, earnings and present and future business prospects, and to correct any previously

11   issued statements that had become materially misleading or untrue, so that the market price of

12   Cell Therapeutics's common stock would be based upon truthful and accurate information. The

13   Individual Defendants' misrepresentations and omissions during the Class Period violated these

14   specific requirements and obligations.

15        13.    The Individual Defendants are liable as participants in a fraudulent scheme and

16   course of conduct that operated as a fraud or deceit on purchasers of Cell Therapeutics's

17   common stock by disseminating materially false and misleading statements and/or concealing

18   material adverse facts. The scheme: (i) deceived the investing public regarding Cell

19   Therapeutics's business, operations and management and the intrinsic value of Cell

20   Therapeutics's securities; (ii) enabled the Individual Defendants and certain Company insiders to

21   collectively sell 2,546,465 shares of their personally-held Cell Therapeutics common stock for

22   gross proceeds in excess of $3.5 million; (iii) allowed the Company to complete an offering of

23   33,731,923 shares of its common stock and warrants to purchase up to 8,432,981 shares of its

24   common stock, whereby the Company received approximately $40.3 million in net proceeds; and

25   (iv) caused Plaintiff and members of the Class to purchase Cell Therapeutics common stock at

26   artificially inflated prices.

CLASS ACTION COMPLAINT - 4
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

## IV.    CLASS ACTION ALLEGATIONS

14.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Cell Therapeutics between May 5, 2009 and February 8, 2010, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

15.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Cell Therapeutics common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Cell Therapeutics or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

17.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

18.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1        (a)    whether the federal securities laws were violated by Defendants' acts as

2  alleged herein;

3        (b)    whether statements made by Defendants to the investing public during the

4  Class Period misrepresented material facts about the business and operations of Cell

5  Therapeutics;

6        (c)    whether the price of Cell Therapeutics common stock was artificially

7  inflated during the Class Period; and

8        (d)    to what extent the members of the Class have sustained damages and the

9  proper measure of damages.

10     19.    A class action is superior to all other available methods for the fair and efficient

11  adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

12  the damages suffered by individual Class members may be relatively small, the expense and

13  burden of individual litigation make it impossible for members of the Class to individually

14  redress the wrongs done to them.  There will be no difficulty in the management of this action as

15  a class action.

16                **V.    SUBSTANTIVE ALLEGATIONS**

17  **A.   Background**

18     20.    Defendant Cell Therapeutics describes itself as a "biopharmaceutical company

19  committed to developing an integrated portfolio of oncology products aimed at making cancer

20  more treatable."

21     21.    One of the products that the Company developed is pixantrone, a phase III trial

22  product, for non-Hodgkin's lymphoma.  The Company describes pixantrone as a "novel

23  topoisomerase II inhibitor with an aza-anthracenedione molecular structure that differentiates it

24  from the anthracyclines and other related chemotherapy agents."  According to the Company,

25  pixantrone, unlike other anthracyclines, is not "cardiotoxic."  In other words, anthracyclines

26  "cause cumulative heart damage that may result in congestive heart failure many years later."

CLASS ACTION COMPLAINT  - 6
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

22.    On March 4, 2004, the Company issued a press release announcing that the U.S. Food and Drug Administration ("FDA") has "provided guidance through the Special Protocol Assessment ("SPA") process for a randomized pivotal trial of Pixantrone in the treatment of relapsed, aggressive non-Hodgkin's lymphoma ("NHL")." The press release continued, in pertinent part, as follows:

> The trial protocol and supporting data are in the final stages of review with the FDA and initiation of the pivotal study is planned for later this month. The trial is designed to examine the complete response (CR) rate, time to tumor progression, and overall survival of patients with aggressive NHL who have failed front-line and at least one second-line multi-agent chemotherapy regimen. Patients will be randomized to receive either Pixantrone or another currently used, single-agent drug of physician's choice. **FDA has indicated that Pixantrone would qualify for accelerated approval based upon the successful conclusion of this trial and supporting data from ongoing and completed clinical studies. The trial is expected to enroll approximately 320 patients with enrollment taking approximately 12 months to complete.**
>
> "Current single-agent treatments for patients who have failed two or more prior multi-agent regimens produce partial responses in only about 10 to 15 percent of patients and those responses are typically short-lived, lasting on average approximately three months. Complete responses are not typically reported in this population of patients with currently available single-agents and are considered by international lymphoma experts and the FDA as the 'gold standard' to demonstrate a clinically meaningful benefit to patients with this disease," stated James A. Bianco, M.D., President and CEO of CTI. "Although anthracyclines are the most potent class of drugs for treating this disease, the cumulative heart damage associated with their use in front-line regimens prevents patients from receiving further treatment with these drugs, leaving them with no approved effective treatment options."
>
> The design for this pivotal trial was supported by phase I/II data from approximately 170 patients with relapsed or refractory, aggressive NHL treated with Pixantrone. In CTI's phase I/II experience of among 36 elderly, relapsed, aggressive NHL patients, 12 patients (33 percent) had significant shrinkage of their tumors with seven patients (20 percent) experiencing a complete disappearance (CR) of their cancer. Importantly, the responses were long-lived with a median duration of response of more than 11 months. The results from these studies indicate that the regimen was generally well tolerated; some dosing was delayed or omitted due to myelosuppression.

CLASS ACTION COMPLAINT - 7
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

> With the initiation of this pivotal study, CTI has two phase III and five phase II clinical studies of Pixantrone planned or ongoing involving single-agent or combination therapy in the treatment of first, second, or third-line aggressive NHL or indolent NHL. In the United States, it is estimated that more than 33,000 patients receive salvage therapy for third-line or greater NHL each year, with more than 60,000 patients receiving multi-agent chemotherapy for front-line or second-line treatment. [Emphasis added.]

23.    On March 25, 2008, the Company issued a press release announcing that "enrollment is complete in the phase III EXTEND (PIX301) clinical trial of pixantrone."

Defendant Singer, commenting on the patient enrollment, stated, in pertinent part, as follows:

> "PIX301 examines the effectiveness of pixantrone in patients with relapsed and refractory diffuse large B cell lymphoma, a population where current therapies seldom induce complete remissions. Based on a blinded current independent assessment of events in the trial we believe we have an adequate sample size of eligible patients to meet the primary objective of the trial."

With regard to the enrollment of patients in the pixantrone study, the press release stated, in pertinent part, as follows:

> About the EXTEND (PIX301) Clinical Trial
>
> The EXTEND clinical trial is a phase III single agent trial of pixantrone for patients with relapsed, aggressive non-Hodgkin's lymphoma who received two or more prior therapies and who were sensitive to treatment with anthracyclines. The trial was conducted at 130 sites in 17 countries. Patients were randomized to receive either pixantrone or another single-agent drug currently used for the treatment of this patient population and selected by the physician. The trial was designed to examine the complete response (CR) or unconfirmed complete response (uCR) rate, time to tumor progression, and overall survival. The study was powered based on a CR rate assumption of less than 5 percent for the control arm and a greater than 10 percent improvement in CR rate for the pixantrone arm. **The study was conducted under a Special Protocol Assessment from the U.S. Food and Drug Administration (FDA) and pixantrone has received fast track designation for this indication.** [Emphasis added.]

24.    Unbeknownst to investors, on March 28, 2008, Cell Therapeutics notified the FDA of an early halt to enrollment for the pixantrone study. This halt invalidated the Company's SPA. Despite knowledge that the Company was no longer operating under the SPA

CLASS ACTION COMPLAINT - 8
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

000700-00 358431 V1

1  protocols agreed to with the FDA, the Company continued to represent that the pixantrone study

2  was operating under an SPA.

3      25.    On November 11, 2008, the Company issued a press release announcing that it

4  "achieved the primary efficacy endpoint of its phase III EXTEND (PIX301) trial of pixantrone."

5  Defendant Bianco, commenting on the results, stated, in pertinent part, as follows:

6          This positive phase III study is validation of Cell Therapeutics
           Inc.'s capabilities in acquiring attractive drug candidates, and
7          designing and implementing a successful phase III trial. These
           data are consistent with the extensive experience with pixantrone
8          in our phase I and phase II studies and demonstrate the ability to
           offer patients with advanced, relapsed NHL the potential to obtain
9          a clinically meaningful response like a complete remission, despite
           having failed multiple other courses of chemotherapy or immuno-
10         chemotherapy.

11  With regard to the pixantrone trial, the press release stated, in pertinent part, as follows:

12         The EXTEND clinical trial is a phase III single-agent trial of
           pixantrone for patients with relapsed, aggressive non-Hodgkin's
13         lymphoma who received two or more prior therapies and who were
           sensitive to treatment with anthracyclines. The trial was conducted
14         at 130 sites in 17 countries. The trial enrolled 140 patients and
           patients were randomized to receive either pixantrone or another
15         single-agent drug currently used for the treatment of this patient
           population and selected by the physician. The trial was designed
16         to examine the complete remission (CR) or unconfirmed complete
           remission (uCR) rate, overall survival (OS) and progression-free
17         survival (PFS). **The study received Special Protocol Assessment
           approval from the U.S. Food and Drug Administration (FDA)**
18         **in 2004 and pixantrone has received fast track designation for
           this indication.** [Emphasis added.]

19
       26.    On January 27, 2009, the Company issued a press release announcing that, after
20
    communication with the FDA, it "expects to begin submission of a rolling New Drug
21
    Application (NDA) and request priority review for pixantrone to treat relapsed aggressive non-
22
    Hodgkin's lymphoma (NHL) in the first quarter of 2009. If granted priority review a decision on
23
    the NDA could occur before the end of 2009." In that regard, Defendant Bianco stated, in
24
    pertinent part, as follows:
25
           This communication from the FDA is a significant milestone for
26         the Company and for patients with relapsed aggressive NHL as this

CLASS ACTION COMPLAINT - 9
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

could be the first drug approved for this unmet medical need. With the potential for three drug approvals in 2009 we are on track to meet our objective of cash flow break even in the fourth quarter of this year.

With regard to the pixantrone NDA, the press release stated, in pertinent part, as follows:

The EXTEND clinical trial was a phase III single-agent trial of pixantrone for patients with relapsed, aggressive non-Hodgkin's lymphoma who received two or more prior therapies and who were sensitive to treatment with anthracyclines. The trial enrolled 140 patients and patients were randomized to receive either pixantrone or another single-agent drug currently used for the treatment of this patient population and selected by the physician.

CTI announced in November 2008 that it had achieved the primary efficacy endpoint of its phase III EXTEND (PIX301) trial of pixantrone (BBR2778). Patients randomized to treatment with pixantrone achieved a high rate of confirmed and unconfirmed complete remissions compared to patients treated with standard chemotherapy (14/70 (20.0%) for pixantrone arm compared to 4/70 (5.7%) for the standard chemotherapy arm, p = 0.02). No patient (0%) in the standard chemotherapy arm achieved a confirmed complete remission compared to 8/70 (11%) of pixantrone recipients. Pixantrone treatment also significantly increased the overall response rate (CR/uCR+PR) with (26/70 (37.1%) for pixantrone arm compared to 10/70 (14.3%) for the control arm, p = 0.003). CR/uCR and ORR were determined by an independent assessment panel that was blinded to the treatment assignments.

The study received Special Protocol Assessment approval from the U.S. Food and Drug Administration (FDA) in 2004 and pixantrone has received fast track designation for this indication. [Emphasis added.]

27.    On January 28, 2009, the Company issued a press release announcing its

"preliminary progression-free survival (PFS) results from its pivotal phase III EXTEND

(PIX301) trial of pixantrone." Defendant Bianco, commenting on the results, stated, in pertinent

part, as follows:

We always believed the effectiveness of pixantrone would translate into a meaningful difference for patients with relapsed aggressive NHL and these dramatic and significant differences in PFS in this tough to treat group of patients provides that evidence. Pixantrone is the first agent in this patient population to demonstrate a significant and meaningful PFS advantage. We believe these data will support a priority review designation on our New Drug

CLASS ACTION COMPLAINT - 10
Case No.



Application (NDA) once we share them with the Food and Drug Administration (FDA).

With regard to the pixantrone study results, the press release stated, in pertinent part, as follows:

The Company had previously announced that its pivotal phase III (PIX 301) EXTEND trial had achieved its primary endpoint with patients randomized to treatment with pixantrone achieving a significantly higher rate of confirmed (CR) and unconfirmed complete remissions (CRu) compared to patients treated with standard chemotherapy (14/70 (20.0%) for pixantrone arm compared to 4/70 (5.7%) for the standard chemotherapy arm, p = 0.02) with no patients in the standard chemotherapy arm achieving a confirmed complete remission. Additionally, pixantrone treatment also significantly increased the overall response rate (CR/CRu+PR) (26/70 (37.1%) for pixantrone arm compared to 10/70 (14.3%) for the control arm, p = 0.003). PFS, CR/CRu and ORR were determined by an independent assessment panel that was blinded to the treatment assignments.

The most common serious toxicities (>5%) seen in previous trials of pixantrone include grade 3 and 4 neutropenia and febrile neutropenia. Complete safety information is not yet available for the study, however, the study was monitored on an ongoing basis by an independent Data Safety Monitoring Committee and no serious concerns were raised.

The EXTEND clinical trial is a phase III single-agent trial of pixantrone for patients with relapsed, aggressive non-Hodgkin's lymphoma who received two or more prior therapies and who were sensitive to treatment with anthracyclines. The trial enrolled 140 patients and patients were randomized to receive either pixantrone or another single-agent drug currently used for the treatment of this patient population and selected by the physician. The trial was designed to examine the complete remission or unconfirmed complete remission rate, overall survival and progression-free survival. **The study received Special Protocol Assessment approval from the FDA in 2004 and pixantrone has received fast track designation for this indication.**

The Company announced on January 27, 2009 that after a pre-NDA communication with the FDA, it expects to begin submission of a rolling NDA and request priority review for pixantrone to treat relapsed aggressive NHL in the first quarter of 2009. [Emphasis added.]

28.     On February 18, 2009, the Company issued a press release announcing its

"updated safety and efficacy data from the phase III trial of pixantrone." Defendant Singer,

commenting on the updated data, stated, in pertinent part as follows:

CLASS ACTION COMPLAINT - 11
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

> We were impressed to see that 84% of patients received at least 5 cycles of pixantrone therapy with a median total dose of 1,475 mg, despite having had significant prior therapy with doxorubicin, an agent in a similar class with cumulative cardiotoxicity. The rapid time-to-response data coupled with the relatively low incidence of traditional anthracycline toxicities and a safety profile that compares favorably to standard chemotherapy, positions pixantrone to live up to the promise of providing patients with relapsed aggressive NHL a meaningful clinical benefit."

With regard to the updated pixantrone safety and efficacy data, the press release continued, in pertinent part, as follows:

> CTI announced in November 2008 that it had achieved the primary efficacy endpoint of its phase III EXTEND (PIX301) trial of pixantrone (BBR2778). Patients randomized to treatment with pixantrone achieved a high rate of confirmed and unconfirmed complete remissions compared to patients treated with standard chemotherapy (14/70 (20.0%) for pixantrone arm compared to 4/70 (5.7%) for the standard chemotherapy arm, p = 0.02). No patient (0%) in the standard chemotherapy arm achieved a confirmed complete remission compared to 8/70 (11%) of pixantrone recipients.
>
> CTI expects to begin submission of a rolling New Drug Application (NDA) and request priority review for pixantrone to treat relapsed aggressive non- Hodgkin's lymphoma ( NHL) in the first quarter of 2009. If granted priority review a decision on the NDA could occur before the end of 2009.
>
> **The study received Special Protocol Assessment approval from the U.S. Food and Drug Administration (FDA) in 2004, and pixantrone has received fast track designation for this indication.** [Emphasis added.]

29.    On April 14, 2009, the Company issued a press release announcing that it "began a rolling submission of a New Drug Application ("NDA") to the FDA for pixantrone to treat relapsed or refractory aggressive NHL." The press release continued, in pertinent part, as follows:

> CTI expects to complete the submission this quarter and will request priority review which if granted could lead to an approval decision from the FDA in Q4 2009.
>
> "This is a significant milestone for CTI as we move pixantrone closer to addressing a truly significant unmet medical need for relapsed or refractory aggressive NHL patients," said James A.

CLASS ACTION COMPLAINT - 12
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

000700-00 358431 V1

Bianco, M.D., CEO of CTI. "The commercialization of pixantrone will drive shareholder value as a result of the large market potential for this product. We believe that the recent significant investment in CTI by a single institutional investor reflects a growing interest in CTI and in particular in pixantrone by the investment community. With added financial resources, CTI can advance pixantrone through the NDA review process while we continue our progress on strategic business development opportunities and relationships."

CTI previously announced that its pivotal phase III (PIX 301) EXTEND trial had achieved its primary endpoint with patients randomized to treatment with pixantrone achieving a significantly higher rate of confirmed (CR) and unconfirmed complete remissions (CRu) compared to patients treated with standard chemotherapy (14/70 (20.0%) for pixantrone arm compared to 4/70 (5.7%) for the standard chemotherapy arm, p = 0.02) with no patients in the standard chemotherapy arm achieving a confirmed complete remission. Additionally, progression-free survival (PFS) results from this study show patients treated with pixantrone experienced a statistically significant improvement in median progression-free survival, compared with other single-agent chemotherapeutic agents (4.7 months vs. 2.6 months, p < 0.01, pixantrone vs. standard chemotherapy) based on an intent to treat analysis. Pixantrone treatment also significantly increased the overall response rate (CR/CRu+PR) (26/70 (37.1%) for pixantrone arm compared to 10/70 (14.3%) for the control arm, p = 0.003).

Pixantrone recipients had a low incidence of severe neutropenia complicated by either fever or documented infections, or severe vomiting or diarrhea. Pixantrone patients also experienced a low incidence of hair loss, a very common side effect of other drugs in this class. Overall, the incidence of serious adverse events was similar between pixantrone and the control arm. The pixantrone patients had a higher incidence of leucopenia and neutropenia and numerically more severe cardiac events (5 vs. 2) with only 1 considered related to the study drug by the investigator. Disease progression reported as an adverse event was less frequent in the pixantrone than in the control arm (1.5% vs. 13.4%).

**The pixantrone study received Special Protocol Assessment approval from the FDA in 2004, and pixantrone has received fast track designation for this indication.** The FDA's fast track programs are intended to expedite the review of drugs that treat serious or life-threatening conditions and demonstrate the potential to address unmet medical needs. The rolling submission process enables companies that have been granted fast track designation to submit sections of the NDA to the FDA as they become available, allowing the review process to begin before the complete dossier has been submitted. [Emphasis added.]

CLASS ACTION COMPLAINT - 13
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

30.    The statements in ¶¶25-29 remained alive and uncorrected throughout the Class Period.  These statements were materially false and misleading because they failed to disclose that the SPA was no longer valid and binding.

**B.    Materially False and Misleading Statements Issued During the Class Period**

31.    The Class Period begins on May 5, 2009.  On that date, the Company issued a press release announcing that "pixantrone is now available on a named-patient basis in Europe." The press release continued, as follows:

> "CTI has worked hard to make pixantrone available in Europe at the prescriber's request as it provides an option for these difficult to treat aggressive NHL patients," noted Craig Philips, President of CTI.  "We continue to work toward potential approval of pixantrone at the end of 2009 in the United States and expect to complete the submission of the New Drug Application to the Food & Drug Administration this quarter."

> "Our experience with pixantrone has been positive with patients achieving a complete response where such a result was not achievable with other treatments," said Prof. Pier Luigi Zinzani, M.D., Institute of Hematology and Oncology, University of Bologna.  "I am pleased that it is now available on a named-patient basis as it has the potential to address a significant unmet need in this heavily pretreated patient population."

> A named-patient program is a compassionate use drug supply program under which physicians can legally supply investigational drugs to qualifying patients.  Under a named-patient program, investigational drugs can be administered to patients who are suffering from serious illnesses prior to the drug being approved by the European Medicines Evaluation Agency.  "Named-patient" distribution refers to the distribution or sale of a product to a specific healthcare professional for the treatment of an individual patient.  In Europe, under the named-patient program the drug is most often purchased through the national health system

32.    In response to the Company's announcement, the price of Cell Therapeutics stock rose $0.80 per share, or 63%, over the next two trading days, to close at $1.27 per share.

33.    On May 7, 2009, Cell Therapeutics issued a press release announcing its financial results for the first quarter of 2009, the period ended March 31, 2009.  Defendant Bianco, commenting on the results, stated, in pertinent part, as follows:

CLASS ACTION COMPLAINT - 14
Case No.



HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 · SEATTLE, WA 98101
(206) 623-7292 · FAX (206) 623-0594

> Our focus for the first half of 2009 was to initiate and complete the NDA submission for pixantrone while we implemented final steps in our cost cutting efforts and raised much needed operating capital on the least dilutive terms possible -- all while cleaning up the Company's capital structure.  We are pleased with our results as reflected in our first quarter financials.  We have cut our net operating losses attributable to common shareholders by 76%, raised gross proceeds of $44.3 million in 2009 and eliminated all of our outstanding preferred stock, while staying on track to complete the NDA submission for pixantrone in June 2009.

With regard to pixantrone, the press release stated, in pertinent part, as follows:

> Recent Highlights
>
> -- Initiated a rolling submission of a New Drug Application (NDA) to the U.S. Food and Drug Administration (FDA) for pixantrone and are targeting completing this NDA submission in June 2009, which if granted priority review could lead to an FDA approval decision as early as December 2009.
>
> -- Pixantrone Phase III study results to be presented at the American Society of Clinical Oncology Conference on June 1, 2009.
>
> -- Pixantrone is now available through a named-patient program in Europe.

34.    On July 22, 2009, the Company issued a press release announcing that it "commenced an underwritten public offering of up to 29,332,107 shares of its common stock and warrants to purchase up to 7,333,027 shares of its common stock."

35.    On July 28, 2009, the Company issued a press release announcing the "closing of its previously announced public offering. . . .  The Company received approximately $40.3 million in net proceeds from the offering."  In connection with the offering, the Company disseminated a registration statement, which incorporated a prospectus (the "Registration Statement").  The Registration Statement did not disclose that the SPA was not longer valid and binding.

36.    On August 24, 2009, the Company issued a press release announcing that the FDA "has accepted and has filed for review the Company's New Drug Application (NDA) for pixantrone as treatment for relapsed or refractory aggressive non-Hodgkin's lymphoma (NHL).

CLASS ACTION COMPLAINT  - 15
Case No.



1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1    A Prescription Drug User Fee Act (PDUFA) date will be established by the FDA regarding the

2    review of the pixantrone NDA by September 4th 2009." With regard to the FDA's acceptance of

3    the pixantrone NDA, Defendant Bianco stated, in pertinent part, as follows:

4           The FDA's acceptance to file our pixantrone NDA represents a
            significant milestone for CTI and for patients with relapsed and
5           refractory aggressive NHL. We look forward to working with the
            FDA and their final decision on our request for priority review.
6

7           37.    On September 16, 2009, the Company issued a press release announcing its

"updated 18-month follow-up clinical data for its phase III EXTEND (PIX 301) trial of
8
pixantrone." Defendant Bianco, commenting on the data, stated, in pertinent part, as follows:
9
            We continue to be impressed by the durability of responses in the
10          pixantrone treatment arm which seemed to improve during the
            study follow up period, compared to the standard chemotherapy
11          recipients - whose responses and duration of response are largely
            unchanged from the initial assessment period. We are also
12          encouraged by the increase in the overall survival estimates,
            especially among those patients whose histologic diagnosis was
13          verified by independent pathologists where 40% of pixantrone
            recipients were alive, compared to 27% for standard chemotherapy
14          at the 1 year landmark period. We plan to submit these updated
            safety and efficacy data to our NDA as part of the 120 Day update.
15
With regard to the pixantrone clinical data, the press release stated, in pertinent part, as follows:
16
            The FDA typically receives updated clinical study data 120 days
17          following the initial NDA submission.

18          The most common (incidence greater than or equal to 20%)
            adverse reactions reported for pixantrone-treated subjects were
19          neutropenia, infection, anemia, leucopenia, thrombocytopenia,
            asthenia, pyrexia, and cough.
20
            Pixantrone has been accepted for standard review by the Food &
21          Drug Administration (FDA), with fast track status with a
            Prescription Drug User Fee Act (PDUFA) date of April 23, 2010.
22
            About the EXTEND (PIX301) Clinical Trial
23
            The EXTEND clinical trial is a phase III single agent trial of
24          pixantrone for patients with relapsed or refractory, aggressive
            nonHodgkin's lymphoma who received two or more prior
25          therapies and who were sensitive to treatment with anthracyclines.
            The trial was conducted at 130 sites in 17 countries. Patients were
26          randomized to receive either pixantrone or another single-agent

CLASS ACTION COMPLAINT - 16
Case No.



HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 · SEATTLE, WA  98101
(206) 623-7292 · FAX (206) 623-0594

drug currently used for the treatment of this patient population and selected by the physician. The trial was designed to examine the complete remission (CR) or unconfirmed complete remission (uCR) rate, time to tumor progression, and overall survival. **The study was conducted under a Special Protocol Assessment from the U.S. Food and Drug Administration (FDA) and pixantrone has received fast track designation for this indication.** [Emphasis added.]

38.    On December 5, 2009, in a presentation before analysts and investors, Defendant Bianco, commenting on the background of pixantrone, stated, in pertinent part, as follows:

We, as I mentioned, acquired Novuspharma in a stock-for-stock transaction, valued at about $136 million at the time, and took over the development of pixantrone, in terms of the clinical development at least, and that led to our first end-of-Phase II meeting with the FDA in 2004. **And at that time we devised what was called the PIX301 study that was done under a special protocol assessment procedure with the FDA.**

The primary endpoint of complete remission, CRU, was actually negotiated and almost, won't say required, but certainly strongly recommended by the FDA as being the endpoint, as were some of the other secondary endpoints you're going to hear about with respect to duration of response, et cetera. In addition, they wanted us to do a randomized study so this, as you'll hear, is the first randomized controlled trial in this population of patients.

Study was quite challenging from an enrollment perspective. We initially targeted 320 patients. **We had discussions with the FDA, essentially cutting the enrollment back to a number where we felt would be adequate to still maintain the initial power assumptions in the trial. That was done in about 140 patients. That discussion happened in January of '07 and in '08 in March we reached 140 patients and we terminated the enrollment in the trial.**

And then subsequently did the primary endpoint analysis in November of last year and then did the database lock for all the subsequent secondary analysis in February of this year. We filed a rolling submission starting in March under the fast track guidelines from the FDA and that rolling submission was completed in June of this year. And then we received notice from the FDA that they agreed to file the application, gave it a PDUFA data of April 23rd, so a standard 10-month review cycle.

And that's where we are with the current regulatory dialog with the agency, which has been moving along, as we've mentioned on our conference calls, at a much accelerated pace given the fact that

CLASS ACTION COMPLAINT - 17
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

there's still another four, four and a half months in the review
cycle before they need to come to a decision. [Emphasis added.]

39.    The statements referenced above in ¶¶31, 33, 35 and 36-38 were each materially

false and misleading when made because they misrepresented and failed to disclose the

following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)    that the SPA was invalidated in March 2008;

(b)    that the Company's pixantrone study enrolled a large number of patients

who did not suffer from aggressive Non-Hodgkin's lymphoma;

(c)    that the Company's pixantrone drug was cardiotoxic; and

(d)    as a result of the foregoing, Defendants lacked a reasonable basis for their

positive statements about pixantrone and its prospects.

40.    Then, on February 8, 2010, the FDA posted its assessment of pixantrone in

advance of its February 10, 2010 advisory meeting.  With regard to the regulatory history of

pixantrone, the FDA Briefing Document stated, in pertinent part, as follows:

The pivotal trial, PIX301, was discussed at an End of Phase 2
meeting on October 8, 2003.  At this meeting, FDA stated,
"Accelerated approval could be based on an interim analysis of a
surrogate endpoint with completion of the trial demonstrating an
improvement on a clinical benefit endpoint (survival or symptom
benefit)."  FDA recommended that the trial assess complete
response and the duration of complete response.  Subsequently,
agreement was reached concerning a Special Protocol Assessment
for PIX301.  **On March 28, 2008, CTI notified the FDA of an
early halt to enrollment for PIX301.  The study was not
stopped at a planned interim analysis and early study stopping
invalidated the applicant's Special Protocol Assessment.**  The
applicant subsequently analyzed their data and began submission
of a rolling NDA on April 13, 2009 with the last module submitted
on June 22, 2009. [Emphasis added.]

41.    On February 8, 2010, in an article entitled "FDA Tough on Cell Therapeutics'

Drug," *TheStreet.com* stated, in pertinent part, as follows:

Last week, I laid out in detail seven reasons why the U.S. Food and
Drug Administration could decide to reject Cell
Therapeutics'(CTIC:Nasdaq ) lymphoma drug pixantrone.

CLASS ACTION COMPLAINT - 18
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

On Monday, the FDA posted a substantially negative assessment of pixantrone in advance of Wednesday's FDA advisory panel meeting. The FDA review hits on almost all seven of the pixantrone concerns and problems I raised.

The entire FDA review of pixantrone is posted to the agency's web site.

Add it all up, and Cell Therapeutics faces a very difficult task convincing the FDA's panel of cancer experts to recommend pixantrone's approval as a treatment for patients with advanced, aggressive non-Hodgkin's lymphoma.

Let's break down the issues I raised about pixantrone last week and see how that compares to what the FDA's reviewers said about the drug Monday:

1. Missing patients?

Last week, I questioned whether the FDA would accept the "positive" results from the phase III "EXTEND" study of pixantrone given that Cell Therapeutics only enrolled 140 of a planned 320 patients.

Recall that Cell Therapeutics has long claimed the FDA was OK with the smaller-than-expected enrollment in the study and that the study's statistical plan was adjusted accordingly. That turns out not to be true.

Monday, the FDA wrote:

"The planned sample size was 320. However, the study stopped early at an unplanned time point, due to poor accrual. A higher level of evidence is usually required in trials which discontinue prior to the final analysis. Based on the Rho family error spending function (Rho parameter = 2) used in the sponsor's statistical analysis plan and with 44% of planned enrollment, the significance level allocated for the submitted analysis would be 0.0096 (0.0014 based on the O'Brien-Fleming-type error spending function). Therefore, the submitted primary analysis would not be significant."

Translation: The pixantrone study failed, even using Cell Therapeutics' own statistical plan due to the low patient enrollment. In order for the pixantrone study to have been positive and statistically significant, the "p value" generated by the final analysis needed to be lower than 0.0096. The actual "p value" was 0.021.

2. Does Cell Therapeutics really have a Special Protocol Assessment?

CLASS ACTION COMPLAINT - 19
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

A Special Protocol Assessment (SPA) is essentially a formal agreement reached between a drug company and the FDA that the design and endpoints of a phase III clinical trial are sufficient for a drug's approval.

Cell Therapeutics executives, including CEO Jim Bianco, have stated repeatedly, in public, that the EXTEND study of pixantrone was conducted under an SPA from the FDA. Many of the company's recent press releases, including one from April 14, 2009, also make the claim.

False!

Here's what the FDA said Monday:

"On March 28, 2008, Cell Therapeutics notified the FDA of an early halt to enrollment for PIX301 [the EXTEND study.]. The study was not stopped at a planned interim analysis and early study stopping invalidated the applicant's Special Protocol Assessment. The applicant subsequently analyzed their data and began submission of a rolling NDA on April 13, 2009 with the last module submitted on June 22, 2009." [Emphasis added.]

Let's repeat that. The FDA states, "The study was not stopped at a planned interim analysis and early study stopping invalidated the applicant's Special Protocol Assessment."

How is Cell Therapeutics going to explain why it lied about having an SPA for the pixantrone study? An SPA was in place at one point in time, but Cell Therapeutics neglected to tell investors that the agreement was yanked.

Perhaps we now know why the company never mentioned having an SPA for the pixantrone study in its filings with the Securities and Exchange Commission, as I outlined last week.

3. How reliable are the response rates in the EXTEND study?

Recall that Cell Therapeutics says the "EXTEND" met its primary endpoint, with 25.7% of pixantrone patients achieving a complete response (CR) or an unconfirmed complete response (CRu) compared to 7.1% of patients in the control arm achieving a CR/CRu.

Last week, I said to watch how the FDA adjudicates the patients deemed to be unconfirmed complete responders (CRu) because in recent years, at least one influential academic group of lymphoma researchers no longer uses CRu as a valid measurement of disease response. Patients are now characterized as complete responders (CR) or partial responders (PR.)



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

The FDA's conclusions were even worse than I had anticipated:

"A non-aggressive histology was found, by central review, in 12/64 (18.8%) patients on the pixantrone and 16/66 (24.2%) patients on the comparator arm. This level of disagreement is consistent with the literature (Pathol Res Pract 1989 184:242, Cancer 1977 39:1071). Among patients with a non-aggressive histology by central review, 5 patients on the pixantrone and 1 patient on the comparator arm achieved a CR/Cru."

Translation: Cell Therapeutics enrolled a large number of patients who didn't suffer from aggressive NHL, per the eligibility rules of the phase III study. Therefore, five pixantrone patients deemed to have a complete response by Cell Therapeutics were thrown out in the FDA's analysis. Likewise, one patient in the comparator arm was similar excluded.

4. Were the patients in the comparator arm of the study treated with the best drugs available?

This was the only issue in my column last week not raised by FDA in Monday's pixantrone review.

5. How sick really were the NHL patients in the EXTEND study?

The FDA tackles this issue above when it found that not all the patients enrolled had aggressive NHL. Moreover, FDA found that the vast majority of patients enrolled outside the U.S. were less heavily pre-treated than the small handful of U.S. patients enrolled in the study.

6. Where in the world did pixantrone actually work?

Last week, I said to be wary of responses to pixantrone by geography, especially if no U.S. patients respond to the drug. That turned out to be completely true:

The FDA, in it review, notes that, "Most patients were accrued outside of the U.S., with 8 patients accrued from 6 sites in the US."Wow! Only eight patients out of 140 total were enrolled in the U.S.

The FDA also states, "Of concern, no patients enrolled in the US attained a CR or CRu."

7. Is pixantrone less cardio-toxic?

Pixantrone belongs to the anthracycline class of chemotherapy drugs, which are well known to cause heart failure at high doses and/or prolonged exposure. Pixantrone is designed to be less toxic to the heart, allowing it to be used in patients who have been



1918 EIGHTH AVENUE, SUITE 3300 · SEATTLE, WA  98101
(206) 623-7292 · FAX (206) 623-0594

000700-00 358431 V1

treated previously with other anthracyclines, according to Cell Therapeutics.

But Monday, the FDA raised serious questions about pixantrone's safety, noting that, "deaths, SAEs (serious adverse events), and grade 3-4 events were all more common on the pixantrone arm.

Moreover, three pixatrone pateints died [sic] due to heart failure compared to a single patient in the study's comparator arm, according to the FDA's analysis.

The FDA goes on to state, "All of this suggests that pixantrone is indeed cardiotoxic, but no conclusions can be drawn concerning its toxicity relative to other anthracyclines/anthracenediones.

When the FDA's advisory panel convenes Wednesday to review pixantrone, the cancer experts are being asked to vote on two big questions:

* The randomized study was stopped at less than 50% of its planned accrual because of poor accrual.  Do the efficacy data support accelerated approval of pixantrone for the proposed indication?

* Is the risk:benefit ratio favorable for the proposed indication?

The advisory panel is going to vote "no" on both questions unless Cell Therapeutics pulls off a miracle.

42.    In response to these statements, which revealed various adverse factors negatively impacting Cell Therapeutics's business, the price of Cell Therapeutics stock fell $0.42 per share, or 39%, to close at $0.64 per share.

43.    The market for Cell Therapeutics common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Cell Therapeutics common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Cell Therapeutics common stock relying upon the integrity of the market price of Cell Therapeutics common stock and market information relating to Cell Therapeutics, and have been damaged thereby.

CLASS ACTION COMPLAINT - 22
Case No.



HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 · SEATTLE, WA 98101
(206) 623-7292 · FAX (206) 623-0594

44.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Cell Therapeutics common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

45.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Cell Therapeutics's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Cell Therapeutics and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## C.    Additional Scienter Allegations

46.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Cell Therapeutics, their control over, and/or receipt and/or modification of Cell Therapeutics's allegedly materially misleading

CLASS ACTION COMPLAINT - 23
Case No.



HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 · SEATTLE, WA 98101
(206) 623-7292 · FAX (206) 623-0594

1  misstatements and/or their associations with the Company, which made them privy to

2  confidential proprietary information concerning Cell Therapeutics, participated in the fraudulent

3  scheme alleged herein.

4      47.    Defendants were further motivated to engage in this course of conduct in order to

5  allow: (i) the Company to complete an offering of 33,731,923 shares of its common stock and

6  warrants to purchase up to 8,432,981 shares of its common stock, whereby the Company

7  received approximately $40.3 million in net proceeds; and (ii) the Individual Defendants and

8  certain Company insiders to collectively sell 2,546,465 shares of their personally-held Cell

9  Therapeutics common stock for gross proceeds in excess of $3.5 million.  The following chart

10  sets forth the insider trading:

| Insider | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| JOHN BAUER | 06/02/09 | 25,000 | $1.76 | $44,000 |
|  | 08/10/09 | 80,000 | $1.50 | $120,000 |
|  |  | 105,000 |  | $164,000 |
|  |  |  |  |  |
| JAMES BIANCO | 09/11/09 | 1,366,108 | $1.43 | $1,953,534 |
|  | 09/25/09 | 318,621 | $1.19 | $379,159 |
|  | 09/25/09 | 100,380 | $1.23 | $123,467 |
|  | 09/25/09 | 5,100 | $1.24 | $6,324 |
|  | 09/25/09 | 100 | $1.23 | $123 |
|  |  | 1,790,309 |  | $2,462,608 |
|  |  |  |  |  |
| DANIEL ERAMIAN | 09/25/09 | 104,276 | $1.25 | $130,345 |
|  |  |  |  |  |
| RICHARD LOVE | 08/12/09 | 70,000 | $1.64 | $114,800 |
|  |  |  |  |  |
| PHILLIP NUDELMAN | 08/14/09 | 164,000 | $1.57 | $257,480 |
|  |  |  |  |  |
| CRAIG PHILIPS | 09/25/09 | 211,500 | $1.24 | $262,260 |
|  |  |  |  |  |
| JACK SINGER | 09/25/09 | 96,380 | $1.23 | $118,547 |
|  | 09/25/09 | 5,000 | $1.24 | $6,200 |
|  |  | 101,380 |  | $124,747 |
|  |  |  |  |  |
|  | **Total:** | **2,546,465** |  | **$3,516,240** |



HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 · SEATTLE, WA  98101
(206) 623-7292 · FAX (206) 623-0594

D.     **Loss Causation/Economic Loss**

48.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Cell Therapeutics common stock and operated as a fraud or deceit on Class Period purchasers of Cell Therapeutics common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Cell Therapeutics common stock fell precipitously as the prior artificial inflation came out.  As a result of their purchases of Cell Therapeutics common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

49.     By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Cell Therapeutics's business and prospects.  Defendants' false and misleading statements had the intended effect and caused Cell Therapeutics common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $2.10 per share on June 1, 2009.

50.     As a direct result of the disclosure on February 8, 2010, the price of Cell Therapeutics common stock fell precipitously, falling by $0.42 per share, or 39%.  This drop removed the inflation from the price of Cell Therapeutics common stock, causing real economic loss to investors who had purchased Cell Therapeutics common stock during the Class Period.

51.     The 39% decline was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price decline in Cell Therapeutics common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of

CLASS ACTION COMPLAINT - 25
Case No.

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 · SEATTLE, WA 98101
(206) 623-7292 · FAX (206) 623-0594

1    Cell Therapeutics common stock and the subsequent significant decline in the value of Cell

2    Therapeutics common stock when Defendants' prior misrepresentations and other fraudulent

3    conduct were revealed.

4    **E.    Applicability of Presumption of Reliance:  Fraud on the Market Doctrine**

5         52.    At all relevant times, the market for Cell Therapeutics common stock was an

6    efficient market for the following reasons, among others:

7              (a)    Cell Therapeutics common stock met the requirements for listing, and was

8    listed and actively traded on the NASDAQ, a highly efficient and automated market;

9              (b)    as a regulated issuer, Cell Therapeutics filed periodic public reports with

10   the SEC and the NASDAQ;

11             (c)    Cell Therapeutics regularly communicated with public investors via

12   established market communication mechanisms, including regular disseminations of press

13   releases on the national circuits of major newswire services and other wide-ranging public

14   disclosures, such as communications with the financial press and other similar reporting services;

15   and

16             (d)    Cell Therapeutics was followed by several securities analysts employed by

17   major brokerage firms who wrote reports which were distributed to the sales force and certain

18   customers of their respective brokerage firms.  Each of these reports was publicly available and

19   entered the public marketplace.

20        53.    As a result of the foregoing, the market for Cell Therapeutics common stock

21   promptly digested current information regarding Cell Therapeutics from all publicly available

22   sources and reflected such information in the prices of the stock.  Under these circumstances, all

23   purchasers of Cell Therapeutics common stock during the Class Period suffered similar injury

24   through their purchase of Cell Therapeutics common stock at artificially inflated prices and a

25   presumption of reliance applies.

26

CLASS ACTION COMPLAINT - 26
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**F.     No Safe Harbor**

54.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Cell Therapeutics who knew that those statements were false when made.

**COUNT I**

**Violation of Section 10(B) of**
**the Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

55.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

57.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which

CLASS ACTION COMPLAINT - 27
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1    operated as a fraud and deceit upon the purchasers of the Company's common stock during the

2    Class Period.

3         58.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity

4    of the market, they paid artificially inflated prices for Cell Therapeutics common stock. Plaintiff

5    and the Class would not have purchased Cell Therapeutics common stock at the prices they paid,

6    or at all, if they had been aware that the market prices had been artificially and falsely inflated by

7    Defendants' misleading statements.

8         59.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and

9    the other members of the Class suffered damages in connection with their purchases of Cell

10   Therapeutics common stock during the Class Period.

<strong>COUNT II</strong>

<strong>Violation of Section 20(A) of<br>the Exchange Act Against the Individual Defendants</strong>

         60.    Plaintiff repeats and realleges each and every allegation contained above as if

14   fully set forth herein.

         61.    The Individual Defendants acted as controlling persons of Cell Therapeutics

16   within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their

17   positions as officers and/or directors of Cell Therapeutics, and their ownership of Cell

18   Therapeutics stock, the Individual Defendants had the power and authority to cause Cell

19   Therapeutics to engage in the wrongful conduct complained of herein. By reason of such

20   conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

21        **WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

22        A.    Determining that this action is a proper class action, designating Plaintiff as Lead

23   Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of

24   Civil Procedure and Plaintiff's counsel as Lead Counsel;

25

26

CLASS ACTION COMPLAINT - 28
Case No.



1918 EIGHTH AVENUE, SUITE 3300 · SEATTLE, WA 98101
(206) 623-7292 · FAX (206) 623-0594

000700-00 358431 V1

1        B.     Awarding compensatory damages in favor of Plaintiff and the other Class

2    members against all Defendants, jointly and severally, for all damages sustained as a result of

3    Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

4        C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

5    this action, including counsel fees and expert fees; and

6        D.     Such other and further relief as the Court may deem just and proper.

7    **JURY TRIAL DEMANDED**

8        Plaintiff hereby demands a trial by jury.

9

10   DATED:  March 12, 2010            HAGENS BERMAN SOBOL SHAPIRO LLP
                                    STEVE W. BERMAN

11                                         KARL P. BARTH

12

13                                         STEVE W. BERMAN

14

15                             1918 Eighth Ave. Suite 3300
                          Seattle, WA, 98101
                          Telephone:  206.623.7292

16                             206.623.0594 (fax)

17                             COUGHLIN STOIA GELLER

18                              RUDMAN & ROBBINS LLP
                          SAMUEL H. RUDMAN

19                             DAVID A. ROSENFELD
                          MARIO ALBA JR.

20                             58 South Service Road, Suite 200
                          Melville, NY  11747

21                             Telephone:  631/367-7100
                          631/367-1173 (fax)

22

23                             DYER & BERENS LLP
                          JEFFREY A. BERENS
                          682 Grant Street

24                             Denver, Colorado 80203
                          Telephone:  (303) 861-1764

25                             (303) 395-0393 (fax)

26

CLASS ACTION COMPLAINT  - 29
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

HOLZER, HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
200 Ashford Center North, Suite 300
Atlanta, Georgia 30338
Telephone:  770/392-0090
770/392-0029 (fax)

Attorneys for Plaintiff

CLASS ACTION COMPLAINT  - 30
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

000700-00  358431 V1