1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

IN RE CELL THERAPEUTICS, INC.
CLASS ACTION LITIGATION

_____

This Document Relates to All Actions

CASE NO. 2:10-cv-00414-MJP

ORDER ON MOTION TO DISMISS

15   The Court, having received and reviewed

16   1.   Motion to Dismiss Consolidated Amended Class Action Complaint for Violation of

17        the Federal Securities Laws (Dkt. No. 57)

18   2.   Lead Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss (Dkt.

19        No. 65)

20   3.   Reply in Support of Motion to Dismiss Consolidated Amended Class Action

21        Complaint for Violation of the Federal Securities Laws (Dkt. No. 67)

22   4.   Surreply in Response to Motion to Dismiss Consolidated Amended Class Action

23        Complaint for Violation of the Federal Securities Laws (Dkt. No. 69)

24

1   and all attached declarations and exhibits, makes the following ruling:

2        IT IS ORDERED that the motion to dismiss Plaintiffs' 10(b) and 10b-5 claims, and their

3   "control person liability" claims, is DENIED.

4        IT IS FURTHER ORDERED that the motion to dismiss the insider trading claim against

5   Defendant James Bianco is DENIED; the insider trading claims against the remaining

6   Defendants will be DISMISSED.

7        IT IS FURTHER ORDERED that Plaintiffs' motion to strike the declarations submitted

8   by Defendants containing statements attributed to the Confidential Witnesses, as well the

9   evidence and argument relating to the increase in Defendant James Bianco's CTI stock holdings

10   during the Class Period (included for the first time in Defendants' reply brief) is GRANTED.

11                              **Background**

12        From the Consolidated Amended Class Action Complaint (CAC; Dkt. No. 50):

13        Cell Therapeutics, Inc. (CTI) is a biopharmaceutical company whose primary business is

14   developing new cancer-fighting drugs.  ¶ 25.  One of the major products in development at the

15   company for the last several years was Pixantrone.

16        In 2004, the Food and Drug Administration (FDA) and CTI entered into a Special

17   Protocol Assessment (SPA).  An SPA constitutes an agreement between the FDA and the drug-

18   developing entity (the "sponsor") that, if the sponsor follows the procedure agreed upon in the

19   protocol and the drug proves efficacious, then it will be approved.  This bypasses some

20   potentially lengthy and costly procedures for New Drug Applications (NDAs).  According to

21   "Guidance for Industry: Special Protocol Assessment, FDA" an SPA can only be modified by

22   written agreement between the FDA and the sponsor and then only if it is intended to improve

23   the study.   Failure to follow the agreed-upon protocol constitutes an understanding that the SPA

24

is no longer binding.  ¶ 27.   Documents from Defendants indicate that the company understood this. ("These agreements may not be changed after the clinical studies begin, except in limited circumstances."  2003 Form 10-K, p. 20; ¶ 62).

The SPA contemplated a study using 320 enrollees (¶ 34), but enrollment was slow and by the end of 2007 less than half the required number had been enrolled.  ¶¶ 39, 41.  CTI made a decision (without agreement by the FDA) to close the study early at 140 enrollees.  The decision to close the study was announced on March 25, 2008, but the announcement did not reveal the fact that (1) the study was closing early (i.e., short of the 320-enrollee original goal) and (2) the FDA had not agreed to the modification.  ¶ 41.  In fact, the 3/25/08 press release stated:

> The study was conducted under a Special Protocol Assessment from the U.S. Food and Drug Administration (FDA) and Pixantrone has received fast track designation for this indication. (¶ 73)

This language (or variations therof) appeared in every press release Defendants issued during the Class Period.  For the next two years, Defendants continued to issue press releases and file public documents which characterized the SPA as still viable and the drug as "fast-tracked" because of it (e.g., "The study received Special Protocol Assessment approval from the U.S. Food and Drug Administration (FDA) in 2004 and Pixantrone has received fast track designation for this indication." 11/11/08 press release, ¶ 84).  Additional statements during that period suggested that the modification of the SPA had been discussed with the FDA (e.g., "We had discussions with the FDA, essentially cutting the enrollment back to a number where we felt would be adequate to still maintain the initial power assumptions in the trial.  That was done in about 140 patients."  12/5/09 earnings call, ¶ 123).  At no time during the Class Period was the fact that the modification had not been agreed upon by the FDA revealed.

1    From April to June, 2009, CTI began a "rolling" NDA with a goal of achieving approval

2    of Pixantrone for public sale.

3    On February 8, 2010, in anticipation of a meeting between CTI and the Oncologic Drugs

4    Advisory Committee (ODAC) for preliminary review of Pixantrone, the FDA published a

5    Briefing Document which revealed for the first time that the early termination of enrollment in

6    March 2008 had invalidated the SPA.  ¶ 125.  CTI's stock dropped 39% in one day.  ¶ 128.

7    On March 22, 2010, at the ODAC meeting, it was further revealed that the early

8    termination of the clinical trial had been done without input or agreement from the FDA.  ¶ 142.

9    At the conclusion of the meeting, the ODAC voted unanimously that CTI's clinical trial data was

10   inadequate to support approval of Pixantrone.  ¶ 143.  CTI stock suffered a one-day drop of 48%.

11   ¶ 144.

12   This class action lawsuit represents the consolidation of a number of separate lawsuits

13   filed against CTI arising out of these circumstances. The CAC alleges violations of securities

14   fraud under § 10(b) of the Exchange Act and SEC Rule 10b-5 against CTI as a corporate entity

15   and against CEO James Bianco, M.D., President Craig Philips, and Executive Vice President

16   Louis Bianco ("the individual Defendants"); and against the individual Defendants for control

17   person liability (under § 20(a) of the Exchange Act and insider trading under § 10(b) and § 20A

18   of the Exchange Act.

19                                          **Discussion**

20   **Standard of Review**

21   For purposes of FRCP 12(b)(6), the Court assumes that the facts plead in the CAC are

22   true.  Under § 10(b) of the Securities Exchange Act (15 U.S.C. §§ 78j(b)) and SEC Rule 10b-5

23   (17 C.F.R. § 240.10b-5), Plaintiffs must plead (1) a material misrepresentation or omission; (2)

24

scienter; (3) a connection between the misrepresentation or omission and purchase or sale of a security; (4) reliance; (5) economic loss and (6) loss causation. <u>Stoneridge Inv. Partners, LLC v. Scientific Atlanta, Inc.</u>, 552 U.S. 148, 157 (2008). With the exception of scienter, these elements are governed by the pleading standards set out in FRCP 8 and 9(b). Plaintiffs are required to allege "enough factual matter (taken as true)" to suggest that a violation occurred (<u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 556 (2007)), drawing all reasonable inferences from the complaint in Plaintiffs' favor. *See* <u>Fouad v. Isilon Sys.</u>, C07-1764MJP, 2008 WL 5412397, at *2 (W.D.Wash., December 29, 2008).

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1940-41 (2009). Because 10(b) claims sound in fraud, the CAC must allege the "time, place and specific content of the false representations as well as the identities of the parties to the misrepresentations" pursuant to FRCP (b). <u>Edwards v. Marin Park, Inc.</u>, 356 F.3d 1058, 1066 (9th Cir. 2004).

## **Plaintiffs' Claims**

### <u>10(b) and 10b-5 violations</u>

Defendants allege three grounds for dismissal of Plaintiffs' 10(b) and 10b-5 claims: (1) insufficient allegations of scienter, (2) no proof of loss causation and (3) Defendants' statements are protected by the "safe harbor" provisions of the Reform Act.

> *1. Scienter*

Defendants attack the lack of a "smoking gun," Plaintiffs' failure to allege a statement from the FDA to CTI (prior to the 2/8/10 Briefing Document) that "the SPA is invalidated" or failure to allege any statements from Defendants prior to February 8, 2010 that "we know the

1   SPA is invalid." But, because direct evidence of scienter is usually only within the knowledge of

2   the defendants, scienter is often plead and proven on the basis of circumstantial evidence.

3   Maclean v. Huddleston, 459 U.S. 375, 390 n.30 (1983).

4          Not only is the Court required to accept the factual allegations of Plaintiffs' amended

5   complaint as true, but the Court's analysis must be aimed at determining "whether all of the facts

6   alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual

7   allegation, scrutinized in isolation, meets that standard." Tellabs, Inc. v. Makor Issues & Rights,

8   Ltd., 551 U.S. 308, 322-23 (2007).   Defendants attack Plaintiffs' circumstantial allegations as

9   being comprised of the kind of evidence which has generally been discredited as adequate to

10  plead scienter when unaccompanied by specific, direct evidence of fraud.  But Plaintiffs'

11  allegations are not devoid of evidence of specific facts demonstrating the existence of scienter –

12  which can established through knowledge of falsity or reckless indifference to falsity (In re

13  Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 977 (9th Cir. 1999) – and the "aggregate" of

14  Plaintiffs' evidence does rise to the level of a "strong inference" of scienter.

15         Two allegations of the CAC comprise particularly strong evidence of scienter.  Plaintiffs'

16  one piece of direct evidence – allegations of a confidential witness (CW 1, described as "a

17  former Vice President of Clinical Development and Regulatory Affairs at CTI;" ¶ 24(1)) that she

18  told two of the individual Defendants (the Biancos) that the SPA had been invalidated by their

19  unilateral actions (¶ 43) – is probably sufficient by itself to support a strong inference of scienter

20  (at least for those two individual Defendants and the company).

21         The other piece of evidence, albeit circumstantial, which creates a strong inference of

22  scienter is the language in Defendants' 10-K forms (e.g., "These agreements may not be changed

23  after the clinical studies begin, except in limited circumstances."  2003 Form 10-K, p. 20; ¶ 62).

24

1    This knowledge is imputable, at a minimum, to the defendant corporation, and gives rise to an

2    inference that the company knew what was required to comply with FDA requirements and that

3    their unilateral deviation from the agreement was not one of the "limited circumstances"

4    permitted; i.e., that CTI had invalidated the SPA.

5        With one exception, the Court does not find that Plaintiffs' remaining "confidential

6    witness" allegations contribute significantly toward establishing the strong inference of scienter

7    which is their burden.  Confidential Witnesses 2, 3 and 4 offer allegations that are, at various

8    points, irrelevant, contradictory and not founded on direct contact or communication with the

9    Defendants.  ¶¶ 24, 43, 48, 49.

10       Confidential Witness 5 is a former Assistant Controller, employed throughout the Class

11   Period, who testifies to CTI's severe financial difficulties (inferring a motive for their alleged

12   concealment of the truth about the SPA).  ¶ 39.  As with much of Plaintiffs' circumstantial

13   evidence, facts of this nature can be used to bolster an inference of scienter.  *See* Howard v.

14   Everex Systems, Inc., 228 F.3d 1057, 1064 (9th Cir. 2000)( "In particular, the potential alarm

15   signals in the face of Everex's possible financial crisis could cast doubt on Everex's optimistic

16   outlook and support a finding of scienter.")

17       The remainder of Plaintiffs' allegations are comprised of circumstantial evidence which

18   Plaintiffs present as either directly supporting an inference of scienter or providing evidence of a

19   motive to engage in fraudulent or reckless misconduct.  The evidence covers areas as wide-

20   ranging as Pixantrone's status as a "core product" of CTI; the Defendants' executive

21   responsibilities and obligations, their years of experience in the pharmaceutical industry and their

22   "hands-on" management style; the Defendants' performance-based salary and bonus structure;

23

24

1    CTI's desperate financial situation; and the Defendants' stock transactions during the Class

2    Period.  ¶¶ 146-158.

3         The Court finds the latter example unpersuasive.  Plaintiffs allege Class Period sales of

4    2,382,465 shares between all three individual Defendants.  This evidence does not support an

5    inference of scienter.  The proper measure of the weight to be accorded this fact lies in the

6    amount of stock *retained.  See* <u>In re Silicon Graphics</u>, 183 F.3d 970, 986 (9th Cir. 1999).  The

7    individual Defendants, after their Class Period sales, retained 73 – 95% of their stock in the

8    company.  Def. Mtn., p. 14.  The inference that they were attempting to benefit from their

9    alleged fraud is weak in the face of retained holdings of that size.

10        Defendants , however, attack the entirety of this evidence as insufficient because of its

11   circumstantial nature and cite case after case where allegations of the sort discussed above have

12   been found inadequate to support the "strong inference" of scienter which proper securities fraud

13   pleading demands.  Defendants' argument overlooks two significant points.  First, the criticism

14   leveled at this type of evidence usually focuses on its insufficiency *in and of itself* to create a

15   proper inference.  The cases cited by Defendants often indicate that evidence of this sort, coupled

16   with "some additional allegation of specific information conveyed to management and related to

17   the fraud," can support a strong inference of scienter.  <u>Metzler Inv. GMBH v. Corinthian</u>

18   <u>Colleges, Inc.</u>, 540 F.3d 1049, 1068 (9th Cir. 2008).  *See also* <u>In re Hansen Natural Corp. Sec.</u>

19   <u>Litig.</u>, 527 F.Supp. 2d 1142, 1159 (C.D.Cal. 2007)(Plaintiff  "*must do more than allege* that…

20   key officers had the requisite knowledge by virtue of their 'hands on' positions");  <u>South Ferry</u>

21   <u>L.P. No. 2 v. Killinger</u>, 542 F.3d 776, 784 (9th Cir. 2008)  ("Where a complaint relies on

22   allegations that management had an important role in the company *but does not contain*

23

24

1  *additional detailed allegations about the defendants' actual exposure to information*, it will

2  usually fall short of the PSLRA standard.")(all emphasis supplied).

3       Plaintiffs have done more than allege that the individual Defendants were highly-placed

4  corporate executives with a "hands-on" management style who had extensive experience in the

5  pharmaceutical industry and stood to benefit financially if investment funds continued to flow in

6  and FDA milestones were met.  They have specifically alleged that two of the Defendants were

7  told that the company's unilateral modification of the SPA would invalidate it, and they have

8  produced evidence that the company publicly acknowledged that modification of the SPA was

9  impermissible except in limited circumstances.  The Court finds that, in light of these specific

10  allegations, the additional allegations of circumstantial evidence do provide strong support to the

11  inference of knowing fraud or reckless misconduct.

12       Second, the Court is mindful of its obligation to look at the totality of the evidence and

13  assess "whether all of the facts alleged, taken collectively, give rise to a strong inference of

14  scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."

15  Tellabs, 551 U.S. at 322-23.  In their totality, the circumstantial and direct facts alleged by the

16  CAC pass the threshold of creating a strong inference of scienter, and the Court has no trouble

17  finding that the inference urged by Plaintiffs from the facts they present is as plausible, and at

18  least as cogent and compelling, as that posited by Defendants.

19

20       *2.   Loss Causation*

21

22       Plaintiffs' CAC must be found inadequate unless it provides Defendants with notice of a

23  causal connection between an economic loss and the disclosure of the alleged misrepresentation

24  (between the "corrective disclosure" and the "market reaction").  Metzler Inv. GMBH, 540 F.3d

1   at 1062 (citing Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 342 (2005)).  There are two

2   "corrective disclosures" – the February 8, 2010 Briefing Document and the March 22, 2010

3   ODAC findings – and Defendants attack them both as not responsible for the market reactions

4   which followed.  The Court undertakes the analysis of this portion of Defendants' motion

5   cognizant of two factors: (1) loss causation is not subject to a heightened pleading requirement

6   under either the PSLRA or the FRCP (Berson v. Applied Signal Technology, Inc., 527 F.3d 982,

7   989-990 (9th Cir. 2008)); and (2) as a highly fact-specific issue, determination of loss causation

8   is "generally inappropriate on a motion to dismiss."  In re Gilead Sci. Sec. Litig., 536 F.3d 1049,

9   1056-1057 (9th Cir. 2008).

10                  a.   *February 8, 2010 Briefing Document*

11

12          Defendants point out that, in addition to revealing the invalidity of the SPA, this

13   document also raised concerns about the efficacy and the toxicity of Pixantrone.  This, they

14   argue, was much more likely the cause of the price drop: while an invalid SPA did not mean

15   certain failure for approval of the drug, efficacy and toxicity concerns would.  Defendants also

16   cite the rebound of the stock price (by March 8 it had climbed to a higher value than on February

17   8) as evidence of no "loss causation" stemming from the news about the SPA.

18          First of all, "loss causation" is not an "either/or" test.  Plaintiffs are only required to

19   allege "a causal connection between the deceptive acts that form the basis for the claim of

20   securities fraud and the injury suffered by the Plaintiff," and are "not required to show that a

21   misrepresentation was the sole reason for the investment's decline in value in order to establish

22   loss causation."  In re Daou Systems, Inc., 411, F.3d 1006, 1025 (9th Cir. 2005).  The doubts

23   raised regarding efficacy and toxicity may well have contributed to the decline in price, but

24   (drawing every inference in favor of Plaintiffs) it is just as likely that the revelation regarding the

1   invalidity of the SPA (which had clearly been a cornerstone of the Defendants' promotion of

2   their efforts) contributed to the drop, and a finding that <u>both</u> were contributing factors would not

3   entitle Defendants to dismissal.

4        Defendants' argument regarding the price rebound is not persuasive.  Loss causation is

5   focused on whether disclosures caused a price drop upon being made known to the market.

6   Assuming that the market responds to new, material information as soon as it becomes publicly

7   available (a permissible assumption under <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 247 (1988)),

8   Plaintiffs have properly alleged that the drop in CTI's stock price on the day of the February 8

9   disclosure occurred in response to new, material, adverse information.  Fluctuations in the price

10  of CTI stock days, weeks or months after the initial drop could be the result of any number of

11  factors and do not invalidate loss causation as plead by Plaintiffs.

12        b.   *March 22, 2010 ODAC Findings*

13

14        Defendants' main point of attack on this allegation is that this "corrective disclosure" did

15  not reveal any new information.  Stating information already known to the market cannot create

16  a corrective disclosure.  <u>Greenberg v. Crossroads Sys., Inc.</u>, 364 F.3d 657, 663 (5th Cir. 2004).

17  This is not a sound argument.  There was new information revealed by this disclosure: not only

18  was the SPA invalidated, but it was disclosed for the first time that CTI had *unilaterally*

19  modified the protocol.  The "corrective" aspect of this revelation was the public realization that

20  (contrary to the impression created by CTI's press releases), the company had not been working

21  "hand in hand" with the FDA to conduct the Pixantrone clinical trials – its decision to cut off

22  enrollment short of 320 patients had not received FDA approval.

23        Defendants make much of the likely impact of the news that ODAC would recommend to

24  the FDA that Pixantrone not be approved.  Unquestionably this was a factor in the stock price

1    drop that occurred in the wake of the reports of the ODAC recommendation.  However, as

2    discussed above, the Court need only find that Plaintiffs have adequately plead that the news

3    regarding the lack of FDA approval *contributed* to the price drop.  The Court agrees with

4    Plaintiffs that their pleadings support that finding.

5          Defendants continue to focus (in their briefing and at oral argument) on the rejection of

6    Pixantrone (both the *potential* for rejection contained in the February 8 disclosure and the

7    *recommendation* for rejection in the March 25 ODAC report) as the more plausible explanation

8    for the market reaction to that information.  Defendants' contention ignores two factors regarding

9    the SPA that the Court finds relevant to the ruling regarding of loss causation.  The first is the

10    potential for "fast tracking" the approval of Pixantrone that the SPA represented (and which CTI

11    promoted in its press releases; "… and Pixantrone has received fast track designation for this

12    indication;" ¶ 73 *et al.*).   It is entirely plausible that the market reacted (at least in part) not just

13    to the news that Pixantrone might not be approved, but to the distinct possibility that (with the

14    invalidation of the SPA) it would not be approved as *quickly*.  Drawing every inference in

15    Plaintiffs' favor, the Court finds it reasonable to infer that investors bought CTI stock not just

16    based on the possibility that Pixantrone would be approved, but that because of the SPA it might

17    be approved more quickly than usual, offering a faster return on their investment.

18          The second factor Defendants fail to acknowledge concerns the March 22 ODAC

19    findings.  While the findings reiterated the pre-existing information that the SPA had been

20    invalidated, the ODAC report offered new information that the FDA had not approved the

21    modification leading to the SPA's invalidation.  This information raised, for the first time, the

22    possibility that CTI had misrepresented or at least mislead the investors by insinuating that the

23    FDA had, for the past two years, *approved* of what they had been doing ("The study received

24

1   Special Protocol Assessment approval from the U.S. Food and Drug Administration (FDA) in

2   2004 and Pixantrone has received fast track designation for this indication." 11/11/08 press

3   release, ¶ 84).  The fact CTI acted unilaterally in modifying (and thus invalidating) the process

4   underlying the SPA was definitely new information and it is not unreasonable to infer the market

5   reacted to the news that the status of the Pixantrone project was not as it had been presented.

6   Investor confidence in the reliability of information being disseminated is unquestionably a

7   factor in corporate goodwill, and also in stock value.

8          Plaintiffs have adequately pled loss causation in connection with both "corrective

9   disclosure" events.

10

11          *3.   Safe Harbor*

12

13          The "safe harbor" provisions of the Reform Act protect two kinds of statements alleged

14   to be misleading:

15    1.   Forward-looking statements accompanied by "meaningful cautionary language"
           (15 U.S.C. § 78u-5(c)(1(A)(i)); and

16    2.   Forward-looking statements unaccompanied by "meaningful cautionary language" which
           are made without actual knowledge of their falsity (15 U.S.C. § 78u-5(c)(1(B)(i))

17

18          Interestingly, Defendants claim that the CAC must be dismissed in its entirety because

19   "most" of the statements alleged to be false or misleading are protected by these safe harbor

20   provisions.  Def. Mtn., p. 19.  Defendants fail to explain how, if some of the statements are <u>not</u>

21   protected, they are still entitled to dismissal.

22          The Court finds a sufficient number of statements are not protected by the safe harbor

23   provisions and Defendants are not entitled to dismissal on this basis.  Defendants focus on the

24

1    cautionary language concerning the perils of new drug approval in every filing or press release.

2    All the statements about the progress of the Pixantrone trials and the company's hopes for

3    approval are properly characterized as "forward-looking" and there is adequate language about

4    "no guarantees" to constitute "meaningful caution," but Defendants' argument misses the point

5    of Plaintiffs' complaint regarding the SPA.

6          The continual references, throughout the Class Period, to the SPA (including the

7    representation that the study was being conducted "under the SPA" and that the drug had been

8    fast-tracked "because of this indication") were not "forward-looking" statements – they referred

9    to what Defendants were alleging as present facts: i.e., the ongoing conduct of the clinical trials

10   for Pixantrone and the "fast-track" nature of the approval process by virtue of the SPA

11   agreement.  What Plaintiffs are complaining about is being misled into believing the SPA was in

12   effect throughout the Class Period when in fact it had been invalidated as of March 25, 2008.

13   Misrepresentations of that nature do not qualify for "safe harbor" immunization.

14         Having said that, the Court finds that the only statements to which this "present fact"

15   analysis applies are the press releases during the Class Period (3/25/08, ¶¶ 71-73; 11/23/08, ¶ 79;

16   11/11/08, ¶84; 1/27/09, ¶ 86; 1/28/09, ¶88; 2/10/09, ¶92; 2/18/09, ¶96; 4/14/09, ¶106; 9/16/09,

17   ¶117; 2/9/10, ¶¶ 130-132) and the earnings call of 12/5/09 (¶ 123: "We had discussion with the

18   FDA, essentially cutting the enrollment back to a number where we felt would be adequate to

19   still maintain the initial power assumptions in the trial;" Defendant. J. Bianco).  The SEC filings

20   (primarily Form 10-K's) are devoid of any representations regarding the SPA, and are replete

21   with cautionary language.  But, as long as the "strong inference" of scienter regarding

22   Defendants' knowledge of the invalidation of the SPA remains standing, the press release

23

24

1    statements stand as more than adequate allegations of dissembling on Defendants' part and

2    Plaintiffs are entitled to prevail on the motion to dismiss their 10(b) and 10b-5 claims.

3

4    Control Person Liability

5            Defendants' argument for dismissal of the § 20(a) "control person liability" claims is

6    premised on their prevailing on their motion to dismiss the underlying 10(b) and 10b-5 claims.

7    Having found for Plaintiffs on that portion of the motion, the Court finds that "control person

8    liability" has been adequately alleged.

9

10   Insider Trading

11           Defendants seek dismissal of these claims based on Plaintiffs' failure to allege

12   "contemporaneous trading" by any of the Lead Plaintiffs.  Contemporaneous trading must be

13   pled with particularity in accordance with FRCP 9(b) and is subject to the PSLRA's heightened

14   pleading standards.  Beubronner v. Milken, 6 F.3d 666, 670 (9th Cir. 1993).  The CAC does not

15   allege the dates on which the Lead Plaintiffs purchased CTI common stock (only pleads

16   conclusorily that the purchase was contemporaneous; ¶ 189).  The accompanying certifications

17   of stock purchases (exhibits to the CAC) plead purchases three days to four months after the

18   alleged "suspicious sales."  CAC, Exh's A-C.

19           Plaintiffs' response is that the stock purchase by Plaintiff Shah was within 2 business

20   days of Defendant J. Bianco's stock sale, and cites unpublished District Court opinions finding

21   trades within four days of the sale to be contemporaneous.   In re Novatel Wireless Sec. Litig.,

22   2010 U.S. Dist. LEXIS 49543, at *25-26 (S.D.Cal. May 12, 2010).  Defendants cite District

23   Court cases from several jurisdictions (including the Ninth Circuit) for the proposition that

24

1  "[w]hen a company's stock is regularly traded… the shareholder must purchase his shares on the

2  *same day* or *one day* after the allegedly suspicious sale to have § 20A standing."  Reply, p. 12

3  (emphasis in original).  *See* In re Countrywide Fin. Corp. Sec. Litig., 588 F.Supp.2d 1132, 1204-

4  05 (C.D.Cal. 2008); In re Fed. Nat'l Mortg. Ass'n Sec. Deriv. & 'ERISA' Litig., 503  F.Supp.2d

5  25, 46-48 (D.D.C. 2007); In re MicroStrategy, Inc. Sec. Litig., 115 F.Supp.2d 620, 664 (E.D.Va.

6  2000).

7          None of this constitutes binding precedent.  The Court finds that there is currently no

8  Ninth Circuit definition of "contemporaneous" as applied to § 20A insider trading, and that two

9  business days is sufficiently close in time to satisfy the term.

10         However, this finding only applies to Defendant James Bianco.  There are no allegations

11 of purchases by Plaintiffs related to sales of stock by any of the other Defendants.  Accordingly,

12 the claim will remain against James Bianco and be dismissed against the remaining Defendants.

13

14                                    **Conclusion**

15         Looked at in their totality, the allegations by Plaintiffs in their CAC create a "strong

16 inference" of scienter which is at least as cogent and compelling as the inference urged by

17 Defendants.  Plaintiffs have adequately pled loss causation regarding both "corrective

18 disclosures."   None of Defendants' statements (except their SEC filings) are entitled to "safe

19 harbor" protection.

20         "Control person liability" has been sufficiently alleged based on the allegations of 10(b)

21 and 10b-5 violations.  The claim for insider trading alleged against Defendant James Bianco will

22 remain; the insider trading claims against the other Defendants will be dismissed.

23

24

1    The clerk is ordered to provide copies of this order to all counsel.

2    Dated February _4_, 2011.

3

4

5                                     Marsha J. Pechman

6                                     United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER ON MOTION TO DISMISS- 17